2015-16-59 Christopher Sipes Here on behalf of the appellants, the inventors here did exactly what the patent law is designed to encourage. They developed a new and better way of treating a disorder, middle of the night insomnia, by giving patients suffering from the disorder both less drug and giving it less frequently. This was a clear departure from the teachings of the prior art. The court itself found... But you're acting as though we're the trier of fact here. We had a bench trial before the district court and the district court found against you. So what's the error that the district court made? The district court made both errors of law and its handling of the prior art and of the objective considerations of non-obviousness, and it made clear errors of fact. And let me start with its handling of the prior art and the legal errors there. There are two of them that make it clear. One of the key departures here was the abandonment of non-prophylactic dosing. That is, treating people who wake up in the middle of the night from insomnia not by giving them drug every night at bedtime, but treating them with drug only in the middle of the night and in a way that avoided problems in the morning. But if someone has no trouble falling asleep, doesn't it make perfectly good sense that he doesn't need the drug when he's going to bed, but if he wakes up in the middle of the night and he doesn't need the drug and so it's for a shorter period of time, so it's a lower dose. Why isn't that very clearly obvious? That's the exact opposite of the teachings of the prior art, and it's exactly that after the fact common sense. Opposite of the teachings of the prior art? The prior art taught, and the court recognized this at page A81, page 71 of his opinion, that the prevailing approach for treating middle of the night insomnia was treating dosing people at nighttime and trying to keep them asleep. And if they woke up given extra dose, they treated it with more drug in the middle of the night. There's reasons for that. As the court recognized, the drive to sleep is much greater at bedtime than it is in the middle of the night. There were prior art studies which showed that even if you gave it to somebody in the morning, it caused them to go to sleep. Actually no, the Kim study actually, Your Honor, was a sedation study. It found that the patients were not allowed to go to sleep. In those studies, they were found to be sedated. But more to the point, there was extensive art that discussed how much was needed, and that art taught away, but there's a more important point. There was specific... So your own art taught that you were... You're talking about Roth and Vogel and... Correct. Roth didn't do a statistical analysis on the 5 milligram treatment, and Vogel seems to say that the 5 milligram treatment was effective in getting people to go to sleep. Vogel says specifically that statistical differences was only seen at 7.5 and above. And Roth, if you look at the error bars, shows that the placebo and 5 milligram overlapped. And those were big studies. Those were studies of over 200, over 400 patients. Roth was 400. The Merlotti and the Kim that they relied on are small. I don't think your statement about Vogel is accurate. If you look at 3073, Vogel says over all doses, that is including the 5 milligram, Zotapim significantly improves sleep efficiency on each of the first four consecutive hours of bedtime, but not thereafter. So, I mean, it does seem to work to some extent at all the doses, right? Well, it did a statistical analysis, Your Honor, and you'll see that there's an indication, this is on A3073, for those that were significantly different from placebo. The 7.5 has that tilde above an entry, and the 5 milligram does not. But there's a more fundamental point here, which is there was art that specifically discussed how to use Zotapim to treat middle of the night insomnia. And that art, for example, was the title bound paper that said specifically that you needed to use 10 milligrams at bedtime and at least 5 milligrams in the night if they woke up, which is much heavier dosing. And it even said, and this was recognized, that if that caused problems in the morning, if there were residual side effects, switch to a different drug. It taught a way from using Zotapim, A, non-prophylactically, and B, in lower doses. And similarly, the art the court relied on, Dalgramji, Danju, and Hindmarch, they too said that Zotapim was not suitable. Dalgramji looked at both Zotapim and Xalapon, a different drug, and said, only Xalapon appears to be suited for middle of the night administration. This isn't 2000. This is after. The district court relied on studies which supported what it said. And why is that clearly wrong? There may be, it may be that you put in contrary evidence, but the district court said it considered all this evidence and it reached a, made a finding, an underlying finding of fact with respect to the obviousness question. How should we set that aside when there's evidence to support it? The court at A99 said specifically it relies for non-prophylactic dosing. It said non-prophylactic dosing, it claims 1 in 12 of the 131 patent, obvious based on Dalgramji, Danju, and Hindmarch, as well as the nature of middle of the night insomnia. That's what it was reasoning for non-prophylactic dosing. Well, Dalgramji, Danju, and Hindmarch specifically say Zotapim is not suitable for middle of the night dosing. So it was relying on the prior art that taught away. And you said it's not suitable? Not suitable. Dalgramji at A3002 looked at both Zolpidem and Zalaplon and said only Zalaplon appears to be suited for middle of the night administration. So this is just like the Eli Liddick case and the Santaris case, where the prior art looked at the option and another option and said only the other option, the unclaimed option, a different drug was suitable. Their own expert, Winkleman, admitted. What page is that? That's A3002. That's Dalgramji. It reads only Zalaplon appears to be suited for middle of the night administration. This is the art the district court relied on. Their own expert, Dr. Winkleman, testified. This is at A1601, testimony at 7.188 through 8.9. The conclusions, talking about this art, Dalgramji and Danju, the conclusions were that if you wanted to choose a drug to use in the middle of the night for insomnia, that you would use Zalaplon and that you would not use Zolpidem. So the very art at A99 that the district court relied on to find it obvious to use Zolpidem non-prophylactically said specifically only Zalaplon is suitable for that use, not Zolpidem. So it relied on art that taught away without properly considering the teaching away and it relied on what it called the nature of middle of the night insomnia. That's the classic hindsight error of looking at something after the fact and saying well it's common sense, it must be obvious. We know it's not common sense because Teitelbaum specifically says use more. This is the only art that specifically discusses how to use Zolpidem in the middle of the night and that art, the Teitelbaum article, says specifically use 10 at bedtime and then add 5 more in the middle of the night. Again, they're all expert in mid, that's what Teitelbaum teaches. And it also says, which is very striking, that if you're having problems with the residual side effects, switch to Zalaplon. So this too directly teaches away from what the court thought was common sense and there's a reason for that because of course it's not common sense. It's only common sense now that the inventors have made their invention. Now it's common sense to go to lower doses. The FDA didn't find it common sense because they, after the invention here, after the inventors had done the clinical studies and submitted the data showing that the low doses worked, they changed the dosing, not just for permitting this drug, Intermezzo, but for all the other Zolpidem containing drug products, including Ambien, which had been around for more than a decade before this invention. And that's at A4031 to A4032. And again, they're expert at A1705, at page 874, lines 18 to 21, admitted after reviewing the Intermezzo studies, which in that article at A431 to A432, FDA said were particularly informative. They reduced the dosing for a drug that had been around for more than a decade before this invention. And, in fact, further demonstrating the mishandling of the art here and the temptation of hindsight, Ambien CR was developed and approved. What's the significance here of the fact that physicians were prescribing half a dose for middle of the night insomnia? Is that itself evidence that relates to the question of obviousness? So the discipline made no finding of prior use of non-prophylactic fractional Ambien. Well, they made a finding that doctors had done it before 2004. The finding actually is, while it is unclear how common the practice was, since it's A20 to A21, at least some doctors were prescribing fractional, half of one Ambien to treat middle of the night insomnia prior to 2001. The problem with that is that's not necessarily non-prophylactic. In fact, Titobiol, the art we're talking about, teaches fractional dose on top of the original dose. What's the significance of that finding that doctors were doing this before 2004? I think it shows that the part was teaching away, because that's extra zolpidem, not less zolpidem. In fact, their expert said the analogy to that... I thought that the testimony the district court relied on talked about middle of the night dosing. So there's two sets of... All of this is post art. So there's two things. There is that December 2008 study of prescribing habits, and of course Titobiol plus fractional, that's A2509. Some doctors instruct patients to cut the Ambien in half and take a second only before 3 a.m., and at A1795, that's Dr. Moline's testimony, at 966 to 67. But is Dr. Laplace, who was one of your witnesses, testified that this was done? And then Winkleman also testified that it was done by physicians, right? The only testimony of non... In fact, the only description of non-prophylactic dosing before the invention here is the testimony in court of Dr. Winkleman, that he said he did it. Now, he also admitted... Where does Dr. O'Klassen say that he's talking about middle of the night dosing after a previous prophylactic dosing? So Dr. O'Klassen was actually an executive at the company. He was not a doctor prescribing it. He said he'd heard about this. He'd heard about people doing this. He was referring to 2004, right? What he said, and this is referring to, was, for example, in 2008, the company did a survey of what doctors were doing. That's what I referred to at A25. I'm talking about his testimony. I think it's 1146. It says, when you began working on Intermezzo, you were aware that physicians were filling Ambien pills to treat middle of the night insomnia correct. And then he says, only in the most anecdotal fashion. So he appears to be admitting that this had happened, right? He received reports that it had happened. So what he's talking about is the marketing survey, I think in December 2008, that they were giving fractional doses. But that study is showing that they were giving fractional doses, this is at A2509, as a second dose on top of bedtime. And at A1795, that's confirmed. The only testimony of a non-prophylactic before was the in-court testimony of their expert, Dr. Winkleman. And he admitted there's no corroboration, no lecture notes, no CLE notes, no patient notes, nothing to corroborate that. And, in fact, he admitted that his own publications throughout this period taught the reverse. For example. Mr. Sykes, you're well into your rebuttal time. I assume you'd like to reserve it. I would like to reserve it. I just have to note that there was no finding by the court about fractional use non-prophylactic. Thank you, Your Honor. Mr. Holdreth? Yes, sir. Thank you, and may it please the Court, I will be presenting the appellee's argument for all of the appellees today. As the Court observed, there was an extensive trial in this case, and the trial judge was very diligent in considering all of the disputes raised in appellant's brief. There was substantial evidence presented by over a dozen witnesses on invalidity, and the trial judge had a basis for each of the findings that he made in this case. The appellants essentially seek to retry the issues that were tried at the trial court in detail to address a couple of questions of the Court just now. Mr. O'Klassen made clear that he was aware of as-needed or non-prophylactic dosing prior to the critical date. It's at A1147. That's volume two of the trial transcript at page 82. He was asked at line 10, this is a study that attempts to quantify the practice of specifically splitting ambient doses with an instruction to take the split ambient on an as-needed basis at the time of awakening. He says yes, and the question was, although you quantified this in 2008, you knew it was going on in 2004 when you started the project, anecdotally. He says anecdotally, only as a possibility. Dr. Winkleman further testified at appendix 1666, which is volume eight of the trial transcript. On page 19, he was asked, you yourself used fractional ambient to treat patients for middle-of-the-night insomnia without prophylactic dosing. He says, absolutely, for years. He was asked, and you used less than five milligrams. He said, I did, and those people were five where I suspected that five milligrams was too much. He continues, we've cited in our briefs further testimony of Dr. Winkleman on that subject. I think the significance of that testimony is both that there was prior use of low-dose fractional ambient as-needed in the middle of the night, admittedly as an oral swallow. So it could be prior art. The trial court considered it only for what it was worth. I think it also is a secondary consideration, showing simultaneous invention at the very least. The prior art was also very clear that low-dose insulpinum was effective to put people to sleep. That's the Kim study that the court just noted. Kim is found in the record at A2733. Kim's explicit conclusion was that when zolpidem 5 milligram and zolpidem 10 milligram treatments, these were oral swallow, were compared to placebo and to each other, a significant reduction in sleep latency on the first four tests was found. There was certainly explicit prior art which explicitly taught that low doses were effective to put people to sleep. One of the critical issues of the trial court was that the 10 milligram zolpidem, the larger dose, was prescribed to keep people asleep all night. It wasn't that there was a belief that that higher amount was necessary to get people to sleep. The trial court had to resolve the evidence which showed that higher dose zolpidem was necessary for all-night sleep. There was no belief that lower dose would not work to get people to sleep. In fact, the prior art explicitly taught that it would. There was also the Merlotti study for that proposition. On the subject of teaching away, the Doug Ramsey reference in particular is very clear that that investigator was investigating the side effects of the commercially recommended 10 milligram dose of zolpidem and zaloplan. And so the only thing that he taught was that 10 milligrams was too much because there were residual sedative effects. There was extensive testimony we cited in our briefs that the teaching of Doug Ramsey, Hindmarch, and Danjue would teach one of skill in the art that 10 milligrams of zolpidem in the middle of the night is too much. And the one of skill would therefore reduce the dose. And that is a fact finding the trial court made. How one of skill in the art understood the references and whether they were teaching away are factual conclusions that were supported by evidence in the record. And so whether or not a different fact finder might reach a different conclusion, that is the conclusion the trial court reached. And it was well supported. Unless the court has other questions, we will rest on our briefs for the remainder. What about the freedom from residual effects? So that was well understood. And the Merlotti study is one of the references that is most clear. That was acknowledged as one of the most significant pieces of prior art. It's found in the record at A2275. And one of the first things that Merlotti says is that artisans working in the field understood it's important to find the lowest effective dose. And that is because it should be less likely to produce adverse effects. And so the skilled artisan was highly motivated to look for the lowest effective dose. That's exactly what the Merlotti study did in order to reduce side effects or residual sedative effects. There was extensive testimony in the record that a skilled artisan would understand how to do a study like Merlotti did in order to find the lowest effective dose. And that was, in fact, admitted by some of the plaintiff's experts. In particular, the defense expert, Dr. Michniak-Cohen, talks about dose finding at A1480 in Volume 6. Dr. Winkleman talks about dose finding in, as far as you may know. His testimony of the site is in our briefs. I apologize, I'm not finding it right away. Dr. Drover and Dr. Seisler, who were plaintiff's experts, talked about the understanding and the art of the importance of finding the lowest effective dose in order to avoid residual sedative effects. And Dr. Seisler is particularly clear on that point at the appendix at 1924 in Volume 10 of the trial transcript. Where he says, the Food and Drug Administration generally requires anyone coming out with a new drug application to identify the lowest effective dose because that minimizes side effects. He was asked, do you agree with that? He said, I agree fully. And then he discussed the Merlotti study as an example of how an artisan could do a routine clinical study with every expectation of success to find the lowest effective dose that would avoid residual sedative effects. Thank you, Mr. Holdry. Mr. Sipes has two minutes. Your Honor, very quickly first as to the fractional dose. At 1147, what Mr. O'Classon is testifying to is as needed at the time of awakening. That's not necessarily non-prophylactic. There's no question that Tidal Bound teaches and the prior art were using 10 milligrams of bedtime and then as needed five more if you woke up. And that's what the 2008 study that's being discussed there found. What is at issue here is the decision to give a low dose in the middle of the night without bedtime dosing. And there's nothing in the prior art except Dr. Winkleman's uncorroborated in-court testimony that shows that everything was moving in the opposite direction. Even Tidal Bound teaches that. That if you're having problems with residual sedative effects, go to a different drug. It was not believed that Zolpidem was suitable for as needed dosing only without prophylactic dosing in the middle of the night. And the references in the district court did not rely on prior use. A99 relied on the art that specifically teaches way. Art that post-states this Merlotti paper by a decade. This is the opposite of the recent Merck case. This is a case in which the teaching way is current and present, the present teaching. A few months after his invention, Sanofi came out with Ambien CR, higher doses to treat middle of the night insomnia. That's at A1672, page 843 and A1671, page 867. That's where the art was going. As to the dose finding, the dose here isn't even five. The claim dose is 3.5. The court at A78 found that obvious. A reasonable expectation of success of 3.5 administered in the middle of the night without any other dosing. Dramatically below the 10 milligram approved FDA dose. We just heard it was the lowest effective dose of what FDA approves. Found that by assuming perfection. One they had to get down to five milligrams, which we think was clear error. Assuming perfection in the art. The court found that a person of ornate skill in the art would expect 100% bioavailability through transmucosal. That's at A89. Thank you, Mr. Sykes. As you can see, the red light is on. So we take the argument and take the case under review. Thank you. Thank you.